

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR - 1 2022

CLERK, U.S. DISTRICT COURT
By_____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

EDDIE TURNER,                          §
                                       §
        Plaintiff,                     §
                                       §
v.                                     §        2:20-CV-290-Z-BR
                                       §
BNSF RAILWAY CO.,                      §
                                       §
        Defendants.                    §

## OPINION & ORDER

Before the Court is Defendant's Motion for Summary Judgment ("Motion") (ECF No. 25),

filed on December 1, 2021. Plaintiff Eddie Turner ("Turner") brings claims under Title VII, 42

U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981 for alleged discrimination. Defendant BNSF

("BNSF") claims it fired Turner because he failed to meet work expectations regarding hours

requirements, failed to meet company-issued attendance guidelines, and other behavior. Having

considered the Motion, pleadings, and relevant law, the Court **GRANTS** the entire Motion.

### BACKGROUND

BNSF is a freight railroad company. BNSF employs train conductors — also known as

"trainmen" or "Train, Yard, & Engine" employees — to operate its locomotives. ECF No. 26 at 7.

BNSF conductors work variable schedules around the clock. *Id.* A conductor's schedule can

include nights, weekends, and holidays. *Id.* Because many BNSF conductor assignments are on-

call due to the nature of train traffic, a conductor's assignment can be unpredictable. *Id.*

BNSF contends, "regular and reliable attendance is a necessary part of being a conductor

and vital to a smooth operating railroad." *Id.* at 8. The company finds "[u]navailability, excessive

absenteeism, and 'low performance'" to be "incompatible with the conductor position." *Id.* "Low

performance" means a conductor's "hours are significantly below [his] potential hours." *Id.* In

such a case, BNSF considers the conductor "to not be working full-time and to fall into the 'low performance' category." *Id.* At BNSF, "there is no set number of hours a train conductor must work to be considered [a] full-time [employee]." *Id.* BNSF compares the number of hours an individual conductor works per month against the average number of hours worked by other conductors. *Id.* When evaluating whether a conductor falls into the "lower performance" category, BNSF does not consider protected absences. *Id.* at 8–9. BNSF uses this comparison to determine the potential number of hours a conductor could have worked and measures the comparison against the number of hours the conductor actually worked. *Id.* at 8.

From 2013 to 2017, BNSF reviewed the work performance of "low-performance" employees to determine whether some form of disciplinary action should be taken. *Id.* at 9. BNSF would first provide informal coaching and counseling to attempt to improve a low-performing employee's performance. *Id.* If an employee's performance did not improve after those measures, "BNSF generally would pursue formal discipline." *Id.*

BNSF hired Turner as a conductor in January 2012. ECF No. 1 at 1; ECF No. 26 at 7. When hired, Turner agreed to comply with BNSF's "New Hire Expectations." ECF No. 26 at 7. The New Hire Expectations required Turner to "[d]emonstrate reliability by reporting to work on time, not leaving work early, and having no unexcused absences." *Id.* Shortly after hiring Turner, BNSF found Turner's performance lacking.[1] *Id.* at 9. BNSF Trainmaster Ben McAllister met with Turner and tried to coach and counsel him about the company's performance expectations. *Id.* McAllister reminded Turner of BNSF's full-time performance expectations and instructed Turner to manage his performance in order to meet those expectations. *Id.* at 9–10. McAllister also told Turner a

---

[1] For instance, BNSF states, "Turner only worked 85.6 hours" in May 2013, while his peers worked an average of 154.1 hours. ECF No. 26 at 9. Stated differently, "Turner worked just 56% of his potential hours compared to his peers." *Id.* BNSF also claims "the dates that Turner did not work reflected a pattern of timing his layoffs to maximize [his] time away from work." *Id.*

future failure to meet expectations would result in formal disciplinary action by BNSF. *Id.* at 10. BNSF sent Turner a letter reiterating the same. *See id.* (detailing text of letter).

Despite BNSF's coaching and counseling, Tuner continued to perform below company expectations. *Id.* Because of Turner's low performance, missed shifts, or attendance-guidelines violations, BNSF issued Turner a "record of suspension"[2] in mid-2013, a formal reprimand in late 2013, a "Level S" — *i.e.*, serious — record suspension in early 2014, a Level S record suspension in mid-2014, a Level S record suspension in early 2015, a formal reprimand in early 2016, a record suspension in early 2016, and a formal reprimand in mid-2016. *Id.* at 10–11. Each Level S record suspension included a 36-month "review period." *Id.* at 11. A "review period" is analogous to a probation period; "BNSF informs the employee that any further rule violation during the review period could result in further disciplinary action." *Id.* Accordingly, BNSF considers it "an act of leniency . . . to issue discipline short of dismissal during Turner's review period." *Id.*

During Turner's review period in August 2017, Turner worked 92.4 hours. *Id.* But BNSF determined his work potential to be 156.4 hours. *Id.* In fact, Turner only worked nine days in August. *Id.* at 9. Turner's work performance was the lowest of any conductor at his station in Amarillo, Texas, during that month. *Id.* BNSF conducted an on-property hearing — called an "investigation"[3] — to determine whether the company should discipline Turner for his low performance in August 2017. *Id.* A union representative was present at Turner's investigatory hearing. *Id.* BNSF permitted Turner and his representative to present exhibits, call witnesses, question BNSF's witnesses, lodge objections, and make statements on the record. *Id.* at 12. At the

---

[2] A "record of suspension" is suspension noted on an employee's record but that does not result in time off of work or loss of pay. ECF No. 26 at 10 n.2.

[3] Under its collective-bargaining agreement with Turner's labor union, BNSF must conduct an "investigation" before it can discipline an employee. ECF No. 26 at 11.

3

hearing, Turner claimed his low performance was caused by marital problems, a last-minute hearing examination, and failure to bring his issues to management's attention because he had just returned from a medical leave and did not want to request more leave so soon. *Id.* Turner continued to work during the month of September, during which BNSF once again deemed him a low-performance employee. *See id.* at 13 (stating Turner only worked eight days during the month for a total of 90.9 hours — as compared to a work potential of 153.2 hours).

Before BNSF dismisses an employee, a team within BSNF's Labor Relations Department — a "PEPA Team"[4] — reviews the investigatory hearing transcripts and exhibits to ensure the noticed charges were proven and disciplinary decisions comply with labor agreements and company policies. *Id.* at 12. Stephanie Detlefsen, BNSF's director of employee performance, issued a "PEPA Recommendation" in support of Turner's termination based on various rules violations. *Id.* For example, those rules include:

> Employees will report to and comply with instructions from supervisors who have the proper jurisdiction. Employees will comply with instructions issued by managers of various departments when the instructions apply to their duties;
>
> Employees must report for duty at the designated time and place with the necessary equipment to perform their duties. They must spend their time on duty working only for the railroad. Employees must not leave their assignment, exchange duties, or allow others to fill their assignment without proper authority. Continued failure by employees to protect their employment will be cause for dismissal;
>
> Employees must not be: 1. Careless of the safety of themselves or others. 2. Negligent. 3. Insubordinate. 4. Dishonest. 5. Immoral. 6. Quarrelsome. or 7. Discourteous. Any act of hostility, misconduct or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

*Id.* at 12–13 ns. 3–5. BNSF also based Turner's termination on the fact that he had an "active" Level S suspension, meaning he was in a review period for his pervious violation. *Id.* at 12–13.

---

[4] The acronym "PEPA" comes from BNSF's "Policy for Employee Performance Accountability." ECF No. 26 at 12.

BNSF's director of administration, general manager of the operations division, and vice president for south region operations were also involved in Turner's dismissal decision. *Id.* at 13. BNSF notified Turner of his termination by letter on October 12, 2017. *Id.*; ECF No. 1 at 2.

Because of Turner's low performance in September 2017, BNSF conducted a second, separate investigation after it terminated Turner. ECF No. 26 at 13. BNSF routinely conducts post-termination investigations for separate violations because a termination decision may be overturned in some cases. *Id.* at 13–14. BNSF notified Turner of the second investigation. *Id.* at 14. Turner did not attend "because a union representative told him that he did not need to attend." *Id.* A union representative — however — attended the second hearing and claimed he had not been in contact with Turner. *Id.* The second, separate investigation also resulted in a decision to terminate Turner for his low performance. *Id.*

During Turner's termination process, Turner "filed a timely Claim of Discrimination with the Equal Employment Opportunity Commission ('EEOC')." ECF No. 1 at 2. The EEOC mailed Turner what he styles his "Right to Sue" letter on September 25, 2020. The letter states the EEOC could not conclude BNSF violated any statutes yet did not certify BNSF complied with any statues. ECF No. 1-1 at 1. And the EEOC made no finding "as to any other issues that might be construed as having been raised" by Turner. *Id.* The letter notified Turner he had 90 days to sue BNSF if he chose to do so. *Id.*

Turner timely filed suit on December 21, 2020. In his Complaint (ECF No. 1), Turner claims BNSF fired him "under false pretenses." ECF No. 1 at 2. Turner — an African-American man — claims BNSF "blatant[ly] discriminat[ed] against h[im] and other African-American[]" employees. *Id.* One such act, Turner alleges, was his termination "simply because of his race." *Id.* According to Turner, BNSF "single[d] out African-Americans and set them up for failure or for

bogus violations." *Id.* On December 1, 2021, BNSF moved "for summary judgment on all claims against it." ECF No. 25 at 1.

### LEGAL STANDARDS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of the motion and demonstrate from the record that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas. Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

When reviewing summary judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). A court cannot make a credibility determination when considering conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If some evidence supports a disputed allegation, so that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

**ANALYSIS**

Turner's Complaint contains two causes of action.[5] ECF No. 1 at 3. First, Turner claims BNSF "violated Title VII" because it "terminated [Turner] on the sole basis or primary basis of his race." Second, Turner asserts BNSF "violated 42 U.S.C. § 1981" because BNSF "intentionally discriminated against [Turner] on the basis of his race which resulted in his termination of employment." *Id.* These acts, Turner alleges, caused "lost wages," "lost earning capacity," and "mental anguish." *Id.*

Courts evaluate racial discrimination under the *McDonnell Douglas Corp. v. Green* burden-shifting framework. 411 U.S. 792 (1973); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (using *McDonnel Douglas* framework in Title VII race-discrimination action); *Pratt v. City of Houston*, 247 F.3d 601, 606 n.1 (5th Cir. 2001) ("The elements of the claims under Title VII and 42 U.S.C. § 1981 are identical."). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Willis v. Cleco Corp.*, 749 F.3d 314, 320 (5th Cir. 2014). The plaintiff must establish a prima facie case by demonstrating he: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)). The fourth prong requires the plaintiff to "show that he was treated less favorably than others 'under nearly identical circumstances.'" *Id.* (quoting *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 259–60 (5th Cir. 2009)). Employees are similarly situated where they "(1) 'held the same job or responsibilities,' (2) 'shared

---

[5] The Court finds — as BNSF claims — Turner did not assert a claim based on BNSF's investigation of Turner. ECF No. 26 at 23. Turner's Response does not argue otherwise. *See generally* ECF No. 31.

7

the same supervisor or had their employment status determined by the same person,' and (3) 'have essentially comparable violation histories.'" *West v. City of Houston*, 960 F.3d 736, 740 (5th Cir. 2020) (quoting *Lee*, 574 F.3d at 260).

If the plaintiff makes a prima facie case of discrimination, the burden of production shifts to the defendant employer to offer some legitimate, non-discriminatory explanation for its adverse employment action. *Lee*, 574 F.3d at 259. "If the defendant makes the requisite showing, the burden shifts back to the plaintiff to offer sufficient evidence to create a genuine issue of material fact, either that (1) the proffered reason is a pretext for discrimination, or is 'false or unworthy of credence,' or (2) the reason, 'while true, is only one of the reasons for its conduct, and another motivating factor' is the plaintiff's protected characteristic." *Newsome v. Ctr. Operating Co., LP*, No. 3:19-CV-01279-E, 2021 U.S. Dist. LEXIS 186271, at *5–6 (N.D. Tex. Sept. 29, 2021). A bare allegation of race discrimination cannot create a genuine dispute as to a material fact. *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997).

### 1.  Turner Satisfies the First Three *McDonnell Douglas* Factors

The first *McDonnell Douglas* factor requires the plaintiff to make a prima facie showing that he is a member of a protected group. *Willis*, 749 F.3d at 320. The second factor requires him to show he was qualified for the position at issue. *Id.* And the third factor requires the plaintiff to show he was discharged or suffered some adverse employment action by his employer. *Id.* Turner satisfies the first *McDonnell Douglas* factor because he is an African American and is therefore a member of a protected group. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . ."). As for the second factor, the Court assumes he was qualified for his position at BNSF because he was employed by BNSF and was terminated for his low performance largely due to his

8

failure to appear for work, rather than on day-to-day, on-the-job-performance obligations. *See* ECF No. 26 at 10–11. Considering the third factor, BNSF terminated Turner. He was therefore discharged or suffered some adverse employment action by his employer, BNSF.

### 2.  **Turner Does Not Satisfy the Fourth *McDonnell Douglas* Factor**

The fourth *McDonnell Douglas* factor requires the plaintiff to show he was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. *Willis*, 749 F.3d at 320. Because Turner does not offer evidence that he was replaced by someone outside of his protected group, he must show he was treated less favorably than other similarly situated employees outside of his protected group. *Id.*

Without citation to evidence, Turner first claims "there is no question African-Americans were treated worse than other races in the Amarillo yard." ECF No. 31 at 10. He claims "BNSF terminated at least three African-Americans for 'violations' where persons of other races were not similarly punished." *Id.* Turner also asserts BNSF more severely disciplined its African American employees than non-African American employees for similar violations in Amarillo. *Id.* The Court will not search the record for evidence in support of Turner's allegations. "Judges are not like pigs, hunting for truffles buried in briefs." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). It is not this Court's duty to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 n.7 (5th Cir. 1992).

Turner, however, begins his Response to BNSF's Motion for Summary Judgment by supplying the affidavits and depositions of four people — Detrick Johnson, Mitchell Johnson, Kendra Brown, and himself, Eddie Turner — BNSF allegedly discriminated against and who lost their jobs as a result of that alleged discrimination. *Id.* at 6. Turner bases his Response — in large

9

part — on the facts that these employees *think* they were discriminated against and some employees worked fewer hours than him in 2017 but were not fired. *See generally id.* The Court keeps in mind that "unsubstantiated assertions are not competent summary judgment evidence" and "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim" when reviewing Turner's evidence of alleged discrimination. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 414 (5th Cir. 2015) (internal marks and alteration omitted); *Ragas*, 136 F.3d at 458.

The Court will not consider Turner's and Mitchell Johnson's affidavits because Turner did not properly disclose them to BNSF. Federal Rule of Civil Procedure 26(a) requires parties to make certain disclosures to each other. Rule 26(e) requires parties to supplement those disclosures in certain circumstances. The Turner and Mitchell Johnson affidavits were signed in October 2020 — two months before Turner filed this lawsuit. *See* ECF No. 32-1 at 2 (Turner's affidavit); ECF No. 32-1 at 29 (Mitchell Johnson's affidavit). Turner did not disclose those affidavits to BNSF until he filed his Response to BNSF's Motion for Summary Judgment. ECF No. 33 at 5–6. Turner's failure to disclose the documents prohibited BNSF from questioning Turner about them in his deposition and from determining whether to depose Mitchell Johnson. *Id.* Rule 37(c) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or was harmless." To date, Turner has failed to justify his failure to disclose the affidavits. And the Court does not see the affidavits among Turner's Rule 26(a)(3) disclosures — which were filed with the Court *after* his Response to BNSF's Motion for Summary Judgment. *See* ECF No. 35. The Court will disregard the affidavits.[6]

---

[6] BNSF also asked the Court to disregard "the inadmissible parts of Turner's declaration." ECF No. 33 at 6. Because the Court finds Turner failed to disclose Turner's affidavit to BNSF and therefore will not consider the document, the

"It has long been settled law that a plaintiff must respond to an adequate motion for summary judgment with admissible evidence." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191 (5th Cir. 1991). Rule 56(c) provides declarations in opposition to summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." To the extent Turner's evidence consists of mere vague or conclusory allegations or lacks foundation, the Court will weigh the evidence appropriately. *See* ECF No. 33 at 6–7 (asking the Court to disregard certain statements in affidavits); *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 920 (5th Cir. 2009) ("Affidavits submitted in opposition to a motion for summary judgment may supplement deposition testimony, but cannot contradict prior testimony without explanation."); *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("[A]ffidavit . . . testimony setting forth ultimate or conclusory facts and conclusions of law [is] insufficient to defeat a motion for summary judgment.").

Turner's affidavit and deposition evidence is insufficient to avoid summary judgment. The relevance of the submitted affidavit and deposition evidence turns on "a variety of factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Diloreto v. Towers Perrin Forster & Crosby, Inc.*, No. 3:09-CV-1280-B, 2010 U.S. Dist. LEXIS 161866, at *8 (N.D. Tex. Aug. 20, 2010). Kendra Brown's statements about BNSF's treatment of its employees — for instance — are largely speculative and do not detail the time, location, or decisionmakers at issue. ECF No. 32-1 at 30. For example, Brown states:

---

Court need not address this argument. The same applies to BNSF's arguments about Mitchell Johnson's declarations. *See id.* at 6–7. But if the Court were to rely on Turner's and Mitchell Johnson's affidavits, the Court would give consider BNSF's arguments and give the evidence appropriate weight.

> African-Americans and other minorities were treated different than white
> employees. Specifically, when it came to areas of discipline, minorities were
> punished more severely than their white counterparts. Specifically, I worked with
> Detrick Johnson, who is African-American, and saw that he was targeted on at least
> two occasions as it was clear they did not like him. The infractions he was written
> up for and ultimately terminated for, were not applied to white employees.

*Id.* And in the evidence Turner cites from Detrick Johnson's deposition, the evidence does not relate to the types of acts for which BNSF disciplined Turner, the timeframe during which BNSF terminated Turner, or the same decisionmakers who disciplined or terminated Turner. *See* ECF No. 32-1 at 34–88. This is only a sampling of the conclusory evidence Turner provides.

In many places, Turner's evidence conflicts with the allegations in his Complaint or past statements. Turner's Complaint alleges, to his knowledge, he "was the only person in his area of employment [who] was terminated during this time period" despite being "one of a few African-Americans working in the railway yard in Amarillo, Texas." ECF No. 1 at 2. Turner also told the EEOC that "[n]one of [his] colleagues [were] African-American." ECF No. 27-1 at 122. Additionally, Turner has blamed his dismissal — at least in part — on his labor union, which he said failed to fairly represent him. *Id.* at 123.

Turner — however — does try to relate *some* evidence to his claims. For instance, Turner claims the discriminatory treatment of Detrick Johnson began with the arrival of Michael Orlikowski, who supervised both Turner and Detrick Johnson. ECF No. 31 at 7; ECF No. 31 at 12 ("Both [Turner and Detrick Johnson] were under the supervision of Orlikowski."). Turner claims "that there was an animus against African-Americans in the Amarillo yard under the supervision of Michael Orlikowski" and "[t]he fact that four African-Americans were terminated in a very short time by the same supervisor is disturbing and at the very least is more than coincidental." *Id.* at 10–11. So, Turner concludes: "[W]e know from the summary judgment evidence that there was

an animus against African-Americans in the Amarillo yard under the supervision of Michael Orlikowski." *Id.* at 11.

But Turner provides no evidence Orlikowski had anything to do with his termination. The evidence suggests the opposite. During his deposition, BNSF asked Turner whether there is a specific person responsible for the discrimination he alleges. ECF No. 27-1 at 25. Turner replied: "It's a company — I feel like it's a company thing.  I can't say that one specific person is responsible for it." *Id.* The evidence is insufficient to establish he and Detrick Johnson are similarly situated because it does show the same person, Orlikowski, determined their employment status or that they had essentially comparable violation histories. *West*, 960 F.3d 736, 740 (5th Cir. 2020). The evidence falls short and contradicts other statements and allegations Turner supplied the Court.

In total, Turner's allegations are based on his belief that BNSF held unidentified non-African-American employees to a lower performance standard than it held him and purported, unspecific observations that BNSF generally treated African-American employees worse than other employees. Such evidence does not establish a prima facie case of discrimination. *Cf. Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) ("While Delaval may have believed he suffered discrimination, there is no evidence that such a belief was reasonable. A subjective belief of discrimination cannot be the basis of judicial relief."). After considering the evidence, the Court finds Turner fails to make a prima facie case of discrimination.

### 3.  Even if Turner Could Make a Prima Facie Showing, He Does Not Offer Evidence Sufficient to Create a Genuine Issue of Material Fact

Even if Turner had made a primary showing, BNSF's evidence provides a legitimate, non-discriminatory explanation for Turner's termination. *See* 574 F.3d at 259. BNSF terminated Turner for a myriad of violations. *See* ECF No. 26 at 10–11; ECF No. 26 at 21 ("Here, BNSF has identified

13

its non-discriminatory reason: Turner failed to meet the company's performance expectations despite being counseled on that very issue in the past, and the company believed that that fact, coupled with the fact that he was already on a review period for prior misconduct, warranted dismissal."). Those violations consistently occurred throughout Turner's employment at BNSF — over a period of several years. *Id.* And in two separate, unrelated hearings,[7] BNSF found cause to terminate Turner. *Id.* at 12–13.

Tuner does not dispute the conduct underlying the disciplinary actions BNSF took against him. For instance, Turner does not dispute he only worked nine days in August 2017 and eight days in September 2017. *See* ECF No. 27-3 at 134–136. Still, Turner asserts "[t]he summary judgment evidence provided by the employees of [BNSF] state an unequivocal atmosphere of disparate treatment between African-Americans and other races at BNSF Amarillo yard." ECF No. 31 at 11. But Turner's Response references no evidence in making this argument. *See id.* at 11–12; ECF No. 26 at 22 ("Turner has no evidence of any other similarly situated employee who had the same or fewer hours [during August and September 2017] under similar circumstances but who was not disciplined."). It merely restates the summary-judgment standard and asserts "[a]t the very least, the evidence raises a material fact issue as to whether or not race was a motivating factor in Mr. Turner's termination." *Id.* at 12. He asserts "[t]he summary judgment evidence shows, even by circumstantial evidence alone, that there existed a pervasive discriminatory policy in the Amarillo yard." *Id.*

---

[7] The Court notes BNSF *did not* hold a hearing on whether Turner should be terminated each time he received disciplinary action. *See* ECF No. 26 at 22 ("BNSF did not terminate Turner's employment the first time he engaged in low performance, but rather attempted to improve his behavior through informal coaching and counseling."). On several occasions, BNSF issued record suspensions or formal reprimands when Turner's conduct and performance record "would have warranted dismissal." *Id.*

14

The Court disagrees. A bare allegation of race discrimination is insufficient to create a genuine dispute as to a material fact. *Swanson*, 110 F.3d at 1186. Turner provides only bare and conclusory allegations in support of his claims.

CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's entire Motion.

**SO ORDERED**.

April __1__, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

15